## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NORMAN McINTOSH, | ) |
| | ) |
| Plaintiff, v. | ) |
| | ) |
| CHICAGO POLICE OFFICERS CHESTER | ) |
| BACH (STAR #20438), DAVID EVANS | ) |
| (STAR #20927), JOSEPH FRUGOLI (STAR | ) |
| #21325) | ) |
| | ) |
| Defendants. | ) JURY TRIAL DEMANDED |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## COMPLAINT

Plaintiff NORMAN McINTOSH, by his attorneys, LOEVY & LOEVY and JENNIFER

BLAGG, complains of Defendants CHESTER BACH, DAVID EVANS, and JOSEPH

FRUGOLI as follows:

### INTRODUCTION

1.     Plaintiff Norman McIntosh was wrongfully convicted of the 2001 shooting death

of Devon Hobson. Plaintiff was totally innocent of the crime and was convicted as a direct result

of Defendants' egregious police misconduct.

2.     Almost two months after the crime, Defendants had no leads, so they conspired to

frame Plaintiff. Lacking any physical evidence or any other evidence whatsoever tying Plaintiff

to the crime, Defendants manipulated and coerced three witnesses – the victim's brother and two

12 year-old boys – into falsely identifying McIntosh as the shooter. In order to cover their tracks,

Defendants created false police reports and other fabricated evidence.

3.     All three witnesses ultimately recanted their identifications of McIntosh. They all

admitted that they did not believe McIntosh was involved in the murder of Devon Hobson, and that the only reason they identified him was because of police manipulation and coercion.

4. Devon Hobson was actually shot and killed by a man named Charles "Eggy" Smith. Indeed, Smith's fingerprints were found on items that Hobson had taken from the shooter shortly before the crime, and Smith drove a car identical to the one described by all three witnesses.

5. There is only one reason that three different witnesses all wrongly identified McIntosh as the shooter in a crime he had nothing to do with and that reason was Defendants' misconduct. This misconduct resulted in Plaintiff being wrongfully convicted and sentenced to 45 years in prison.

6. After approximately 15 years in prison, Plaintiff was finally vindicated. Because of the overwhelming evidence pointing to Charles Smith's guilt and Plaintiff's innocence, the State moved to dismiss all charges against Plaintiff. His conviction was vacated and he was set free on October 4, 2016.

7. Plaintiff now brings this action to obtain justice and redress for the devastating injuries that Defendants have caused him.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

9. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, and many if not all of the Defendants reside in this judicial district.

**PARTIES**

11.     Plaintiff Norman McIntosh, who lived in the City of Chicago at the time of the events at issue, spent approximately 15 years in prison for a crime he did not commit.

12.     At all times relevant hereto, Defendants Chester Bach (Star No. 20438), David Evans (Star No. 20927), and Joseph Frugoli (Star No. 21325) were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

13.     The City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the individual Defendants. The City of Chicago is liable for the acts of the individual Defendants while acting within the scope of their employment for the City.

**FACTS**

**The Hobson Murder**

14.     At approximately 9:39 am on November 24, 2001, 21-year old Devon Hobson was shot and killed at 1832 West 60th Street on the South side of Chicago. At the time he was shot, Devon Hobson was with his older brother, James Hobson; his 12-year old cousin, Darius Thompson; and Darius's 12-year old friend, Aaron Smith.

15.     Earlier that day, Devon Hobson, James Hobson, Darius Thompson and Aaron Smith robbed a man driving a four-door gray Oldsmobile at gunpoint. They pretended to be selling marijuana on the corner, and when the vehicle stopped they robbed him. They took money, drugs, and compact discs. After being robbed, the man in the car announced that he was a member of a street gang, and that he was going to come back and kill them.

16.     A short time after the robbery, the four boys were walking down the street and saw the same four-door Oldsmobile driving up. The same man they had robbed earlier was now holding a gun. The man shot at the boys as they ran away, hitting James Hobson and Devon

18

Hobson. James survived, but Devon lost his life.

## Defendants' Initial Investigation

17.     Defendants Evans, Bach, and Frugoli, as well as Officer Kevin O'Brien –
Area 1 detectives and investigators – were among those initially assigned to investigate the
death of Devon Hobson. They interviewed the three boys who survived, all of whom had
observed the shooter but had never seen him before that day and did not know who he was.
Other than a general physical description of the shooter and the vehicle, they could not
identify the shooter.

18.     By early January 2002, the Police Officer Defendants had no significant leads.

19.     They thereafter conspired among themselves, and with others, to frame Plaintiff
for the murder.

20.     On or about January 9, 2002, Defendants Bach and Evans showed up at James
Hobson's house without warning and showed him a photo array containing approximately five
photographs, one of which was a picture of Plaintiff. James did not believe Plaintiff or any of
the other individuals pictured was the shooter. When James told this to Defendants Bach and
Evans, they told him to pick the photograph of Plaintiff. They told James that Plaintiff was the
person that had shot and killed his brother, Devon, and that Plaintiff had been caught riding in
the same four-door Oldsmobile. Based on this and other unduly coercive and suggestive tactics,
James Hobson selected the photograph of Plaintiff.

21.     None of these improper tactics were documented in police reports or otherwise
disclosed to Plaintiff. Police Officers Joseph Patterson, John Ball, Michael Kennedy, and
Daniel Brannigan – the Police Officer Defendants' supervisors – approved and ratified these
actions.

22.     Based on this manipulated identification from a photo array, on January 16, 2002,

18

the Police Officer Defendants had Plaintiff arrested and brought to the Area 1 Detective Division.

23.     At the time of Plaintiff's arrest, the Police Officer Defendants had no probable cause and no legitimate evidence or other non-fabricated reasons to suspect Plaintiff of the Hobson murder. Plaintiff's name had not come up during the investigation at any prior point, and there was no physical evidence tying Plaintiff to the crime in any way. Nevertheless, Officers Patterson, Ball, Kennedy and Brannigan approved the false arrest and allowed Plaintiff to be detained without probable cause.

24.     On January 17, 2002, the Police Officer Defendants rounded up James Hobson, Darius Thompson, and Aaron Smith and had them brought to Area 1 Detective Division to view lineups containing Plaintiff. Defendants Bach, Evans, Frugoli, as well as Officers Will Svilar, Kevin O'Brien, Robert Williams, John A. Frank, Joseph Stachon, John Jarvis, William Ogletree, Jr., and Louis Vasquez participated in, conducted, and approved the lineups.

25.     James Hobson went first. Again using unduly suggestive and coercive tactics, the Police Officer Defendants manipulated James into selecting Plaintiff. Before the lineup the Police Officer Defendants showed James the same pictures of Plaintiff that they had previously shown him at his house. They also told him – falsely – that Plaintiff had been caught driving a car like the one the shooter was driving when Devon Hobson was shot. James Hobson then viewed the lineup and selected Plaintiff.

26.     In addition to the unduly suggestive and coercive tactics set forth above, the Police Officer Defendants threatened to charge James for the initial armed robbery of the shooter if he did not help them to frame Plaintiff.

27.     Also on January 17, 2002, the Police Officer Defendants' unduly suggestive and coercive tactics continued in the subsequent lineups viewed by Darius Thompson and Aaron

Smith, both of whom were only 12 years old.

28.     As they had done with James Hobson, the Police Officer Defendants showed Thompson photographs of several individuals, including Plaintiff. Thompson did not believe that Plaintiff or any of the other individuals pictured was the shooter. The Police Officer Defendants then pointed to the picture of Plaintiff and told him that Plaintiff was the shooter.

29.     In addition, at the time of the first lineup viewed by James Hobson, Plaintiff was wearing a red shirt. He was the only person in the lineup wearing a red shirt. After the first lineup, the Police Officer Defendants caused James Hobson to come into contact with Darius Thompson and Aaron Smith, and in the Police Officer Defendants' presence, James told the two 12-year old boys to pick the person in the red shirt.

30.     After viewing photos of Plaintiff and being fed information by James Hobson, Darius Thompson and Aaron Smith each viewed lineups that included Plaintiff in a red shirt. They each selected Plaintiff. They did so based only on the information that was fed to them.

31.     At no time did the Police Officer Defendants or any other officer document any of their identification and lineup shenanigans involving James Hobson, Darius Thompson and Aaron Smith. That information was concealed from Plaintiff. Officers Patterson, Ball, Kennedy, Brannigan, Vasquez, Ogletree, and Jarvis ratified and approved the Police Officer Defendants' misconduct.

**The Police Officer Defendants Cover Up Their Misconduct**

32.     Concerned that James Hobson, Darius Thompson, or Aaron Smith might later reveal the truth – that Plaintiff was not the shooter and they only picked him in lineups because of egregious police misconduct – the Police Officer Defendants set out to cover up their January 17 lineup misconduct.

33.     Among other things, they concealed documentation and evidence showing that

James Hobson, Darius Thompson, and Aaron Smith were all at the Area 1 Detective Division at the same time on January 17, and that James Hobson had viewed a first lineup that day. They did so by drafting a series of fabricated police reports and lineup photos to make it appear as though James Hobson did not view a lineup until January 18 (and therefore could not have fed information to Darius Thompson and Aaron Smith on January 17).

34.     The officers involved in fabricating a January 18 lineup viewed by James Hobson included Defendants Bach, Evans, and Frugoli, as well as Officers Svilar, O'Brien, Stachon, Vasquez, and Jarvis. The false reports were signed and approved by Defendants Bach and Evans, as well as Officers Stachon, Kennedy, Ball, Jarvis, and Ogletree. All of these officers, as well as other supervisors of the Police Officer Defendants, knew that the reports, and statements contained therein, were manufactured.

35.     As set forth below, years after Plaintiff's conviction, James Hobson, Darius Thompson, and Aaron Smith came forward and revealed the full extent of the Defendants' misconduct. At that time, in furtherance of Defendants' cover-up and conspiracy, Officer Brannigan (now serving as an investigator for the Cook County State's Attorney's Office Conviction Integrity Unit) met with Hobson, Thompson, and Smith and tried to coerce each of them into disavowing their sworn statements about Defendants' misconduct.

**Plaintiff's Trial and Wrongful Conviction**

36.     In December 2003, following a bench trial in the Circuit Court of Cook County, Plaintiff was wrongfully convicted of the murder of Devon Hobson. Plaintiff was sentenced to a 45-year term of imprisonment in the Illinois Department of Corrections. Defendant Evans was called as prosecution witness at that trial and testified falsely in furtherance of the scheme to convict Plaintiff of murder without regard to Plaintiff's guilt or innocence.

37.     Without Defendants' misconduct set forth above, Plaintiff would never have

18

been prosecuted for or convicted of Devon Hobson's murder.

38.     In addition, neither Plaintiff nor his criminal defense counsel was aware at the time of Plaintiff's criminal trial of the concealment of evidence, fabrication of evidence, and manipulation of eyewitnesses that is set forth in this Complaint. Had these facts been disclosed, Plaintiff would not have been convicted.

### Plaintiff's Innocence and Eventual Exoneration

39.     From the first time Plaintiff was questioned by police to this day, he has always maintained his innocence, because he is innocent.

40.     Other than false and fabricated evidence, there has never been probable cause, or any legitimate basis whatsoever, for Plaintiff's arrest, prosecution, and conviction. There was no fingerprint, ballistic, or firearms evidence pointing to Plaintiff. Any such evidence pointed away from Plaintiff: for example, the items that the four boys had stolen from the shooter were recovered by the police; Plaintiff's fingerprints were not on any of the items.

41.     Ample additional evidence available to the police made it all the more clear that Plaintiff was not the perpetrator. James Hobson, Darius Thompson, and Aaron Smith observed the shooter driving a four-door Oldsmobile, but Plaintiff owned a two-door Oldsmobile at the time. Furthermore, Plaintiff's two-door car had been towed by the City's Streets and Sanitation department in September 2001 and remained in the City's tow lot until it was destroyed in April 2002.

42.     Plaintiff also had an alibi. On the morning of the shooting, Plaintiff's girlfriend, Iashiskala Sims, drove him to Mercy Hospital for medical treatment related to an infection. Plaintiff was discharged from the hospital after 7:00 am. Sims drove Plaintiff from the hospital to her house, in her car. They spent the rest of the day together.

43.     Throughout his wrongful incarceration, Plaintiff worked tirelessly to establish that

he was innocent and wrongfully convicted of the Hobson murder.

44.     Finally, approximately a decade after Plaintiff's wrongful conviction, James Hobson came forward and revealed that Plaintiff was not the person he had observed shoot his brother Devon, and that the only reason he had identified Plaintiff was because of the unduly suggestive and coercive tactics set forth above. Hobson provided sworn testimony to this effect, and admitted to telling Darius Thompson to pick the person in the red shirt.

45.     Darius Thompson and Aaron Smith also came forward and admitted that Plaintiff was not the person they observed shooting Devon Hobson, and that they only identified Plaintiff because they had been told to do so.

46.     James Hobson further revealed that he had received credible information that the person who had shot his brother was a man named Charles "Eggy" Smith. Further investigation revealed that Charles Smith's fingerprints were found on the items that had been stolen from the shooter, and that at the time of Devon Hobson's murder, Charles Smith drove a four-door Oldsmobile that matched the description of the shooter's car.

47.     Finally, in October 2016, faced with overwhelming evidence of Plaintiff's innocence and Charles Smith's guilt, the Cook County State's Attorney's Office requested that Plaintiff's conviction be vacated. The State's Attorney's Office made the request only after it had conducted a reinvestigation of the case and determined that it could not stand by the conviction based on the evidence.

48.     On October 4, 2016, Cook County Circuit Court Judge Evelyn Clay, who convicted Plaintiff at his original trial, granted the motion to vacate the conviction and dismiss all charges. Upon issuing her ruling, she apologized to Plaintiff's family and stated, "[A]n injustice has been corrected."

**Plaintiff's Injuries**

18

49.     During his fifteen years of wrongful imprisonment, Plaintiff was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths, and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely as an autonomous being.

50.     As but one example of the nightmare he endured, Plaintiff's son was born eight months after his conviction. For the first 15 years of his son's life, Plaintiff could interact with him only within the impersonal confines of a prison visiting room.

51.     Plaintiff was detained in harsh, dangerous, and isolating conditions in maximum security prisons. He was branded a murderer.

52.     As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison - all without the benefit of the life experiences that ordinarily equip adults for such a task.

53.     In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, and other physical and psychological effects.

**Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process**

54.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

55.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) procuring false witness testimony; (2) concealment of exculpatory

18

evidence; (3) manipulation of witnesses in order to obtain false identifications; (4) manipulation of witnesses in order to influence their testimony; and (5) the use of other tactics to secure the arrest, prosecution, and conviction of a person without regard to his actual guilt or innocence of the offense.

56.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to witnesses to obtain false witness statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, including juveniles, who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

57.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, procured false testimony from witnesses knowing full well that their testimony was false and would lead to the wrongful conviction of Plaintiff. The tactics and inducements used to gain cooperation from these witnesses were concealed from Plaintiff.

58.     The municipal policy and practice described in the preceding two paragraphs was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia,* that Chicago police detectives would feed information to witnesses and coach them through court-reported

and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories. In the FBI 302 Report, the municipal policy and practice is described as a general practice, and also specifically in the context of an Area 1 homicide that occurred in the years preceding the shooting death of Devon Hobson.

59.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

60.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

61.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, *Fields v. City of Chicago*, 1:10 Civ. 1168 (N.D. Ill.) and *Jones v. City of Chicago*, 87 Civ. 2536, 88 Civ. 1127 (N.D. Ill.).

62.     Like this case, *Fields* involved a homicide investigation conducted by the Area 1 Detective Division. Exculpatory and impeaching material contained in a clandestine "street file" was not disclosed to Mr. Fields at the time of his 1986 criminal trial or his 2009 re-trial. During civil discovery in *Fields v. City of Chicago*, hundreds of other clandestine street files from Area

1 for the period from 1979 to 2006 were discovered in the same set of file cabinets where Mr. Fields' undisclosed street file was found. Of those, street files for the period from 1983 to 1989 and 1999 to 2006 were reviewed and found to routinely contain exculpatory and impeaching material that was not disclosed to criminal defendants and prosecutors. A jury presented with this evidence in Mr. Fields' case reached a $22 million *Monell* verdict finding that the City of Chicago maintained an unconstitutional policy and practice of withholding exculpatory or impeaching material from criminal defendants.

63.     The policies and practices at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Hobson murder and investigation at issue here. In addition, a clandestine street file for the Hobson murder was found in the same file cabinets in which Mr. Fields' undisclosed street file was found. The Hobson street file contains dozens of pages of police investigative material withheld from Plaintiff's criminal defense attorney and prosecutors. The Hobson street file was part of the evidence presented to the *Fields* jury.

64.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects, all with the express or tacit approval of Chicago Police Department supervisors.

65.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including the named Defendants, manipulated, tricked, and improperly influenced the testimony of James Hobson, Darius Thompson, and Aaron Smith.

66.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

67.     Prior to and during 2002, the year in which Plaintiff was falsely charged with the Hobson murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

68.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

69.     As a result of the City of Chicago's established practice of neither tracking nor identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

70.     In 2017, after an in-depth study of the Chicago Police Department, the U.S. Department of Justice issued a report entitled *Investigation of the Chicago Police Department*.

That report found that current officers and former high-level officials of the Chicago Police Department acknowledged a "code of silence" within the Department.

71.     That code of silence has existed for decades, including at the time of the investigation and conviction of Plaintiff. Indeed, in the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that, as of 1994, the Chicago Police maintained a code of silence that facilitated police misconduct. And in *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

72.     The U.S. Department of Justice's recent report "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

73.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

74.     As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens, including at the time of Plaintiff's arrest and prosecution.

75.     This includes Defendants in this case. By way of example, Defendant Frugoli was indicted and found guilty in a drunk driving incident that led to the death of two individuals. Frugoli was off duty drinking with fellow officers at a tavern in Chicago. He got intoxicated, left

the tavern, and then struck a car pulled over on the side of the road, killing both passengers. Instead of calling for help, Frugoli got out of his car and fled on foot. Frugoli was eventually apprehended with a blood alcohol level of 0.277 - over three times the legal limit. Frugoli had previously been involved in several alcohol related incidents that were covered up by the Chicago police. Frugoli was involved in an auto accident where the contributory causes were speeding and consumption of alcohol. Frugoli also drove a police car into a concrete barrier. And Frugoli was involved in an auto accident in which, after becoming intoxicated, he failed to stop at a stop sign, struck a Chicago police car, and injured an on-duty Chicago police officer. The Chicago Police failed to discipline Frugoli for these incidents.

76.    In addition, the Police Officer Defendants in this case have a history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. Examples include the following:

a. In *People v. Pleasant*, Defendant Evans engaged in similar conduct. In that case, one of the witnesses testified that he had never viewed a lineup containing the defendant, Edward Pleasant, and that the only time he was asked to make an identification was after Defendant Evans showed him a single picture of Mr. Pleasant. Yet, the State presented evidence of a lineup photograph that Defendant Evans claimed was viewed by the witness. The witness denied it. Another witness testified that he had chosen the defendant from a photo array, but only after Defendant Evans showed him the photo array in front of other witnesses and allowed the other witnesses to tell him who to pick.

b. Defendants Bach, Evans, and other Area 1 police officers were named in a lawsuit where Kelwyn Sellers alleged conduct almost identical the misconduct in this case. In

18

that case, police officers put Sellers in a lineup after holding him overnight. When the witness was unable to identify Sellers, police officers manufactured a false police report claiming that the witness has identified Sellers.

77.     The Defendants engaged in the foregoing misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

78.     The City of Chicago and its Police Department also failed in 2002 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.      The need to refrain from manipulative or potentially coercive conduct in relation to witnesses, including juvenile witnesses in particular.

c.      The risks of wrongful conviction and the steps police officers should take to minimize risks.

d.      The risks of engaging in tunnel vision during investigation.

e.      The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

79.     The need for police officers to be trained and supervised in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

80.     The U.S. Department of Justice's recent report found that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

81.     On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

82.     The City's failure to train, supervise, and discipline its officers, including many of the Police Officer Defendants, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

83. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

84. The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### COUNT I – 42 U.S.C. § 1983,
### Due Process, Wrongful Conviction & Illegal Confinement
### (Fourteenth Amendment)

85. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

86. As described more fully above, the individual Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, his right not to be wrongfully convicted, and his right to be free of involuntary confinement and servitude.

87. In the manner described more fully above, Defendants deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

88. In the manner described more fully above, Defendants fabricated evidence and manufactured and solicited false evidence— including witness statements and witness testimony from James Hobson, Darius Thompson, and Aaron Smith that they knew to be false— implicating Plaintiff in the crime that they knew he did not commit; falsified police reports falsely implicating Plaintiff in the crime; obtained Plaintiff's conviction using that false

evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

89.     In addition, based upon information and belief, Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

90.     Defendants' misconduct resulted directly in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

91.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

92.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT II – 42 U.S.C. § 1983**
**Deprivation of Liberty without Probable Cause**
**(Fourth and Fourteenth Amendments)**

93.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

94.     In the manner described more fully above, the individual Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

95.     In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable

cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and with malice.

97.     As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT III – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

98.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

99.     The individual Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution; by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, as described above.

100.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

101.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

102.     The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

103.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene

104.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

105.    During the constitutional violations described herein, one or more of the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

106.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

107.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT V – State Law Claim
### Intentional Infliction of Emotional Distress

108.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

109.    In the manner described more fully above, the individual Defendants engaged in extreme and outrageous conduct.

110.    The Defendants either intended that their conduct would cause severe emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

111.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

112.    As a direct and proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

### Count VI – State Law Claim
### Malicious Prosecution

113.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

114.     All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

115.     The Defendants accused Plaintiff of murdering Devon Hobson, knowing that he was innocent of the crime. Defendants fabricated evidence, manipulated witnesses, including juvenile witnesses, and withheld material exculpatory evidence. The Defendants knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

116.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

117.     As a direct and proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including but not limited to severe emotional distress, as is more fully alleged above.

### COUNT VII – State Law Claim
### Civil Conspiracy

118.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

119.     As described more fully in the preceding paragraphs, each of the individual Defendants, acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

120.     In furtherance of the conspiracy, Defendants each committed overt acts and were

otherwise willing participants in joint activity.

121.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

122.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to severe emotional distress, as is more fully alleged above.

## Count VIII – State Law Claim
## Indemnification

123.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

124.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

125.    The individual Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

126.    The City is liable to indemnify any compensatory judgment awarded against the individual Defendants.

## Count IX – State Law Claim
## Respondeat Superior

127.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

128.    In committing the acts alleged in the preceding paragraphs, the individual Defendants were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

129.    The City of Chicago is liable as principal for all torts committed by its agents.

WHEREFORE, Plaintiff, NORMAN McINTOSH, respectfully requests that this Court

enter judgment in his favor and against Defendants CHESTER BACH, DAVID EVANS, and

JOSEPH FRUGOLI, awarding compensatory damages, punitive damages, costs, and attorneys'

fees, as well as such further and additional relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, NORMAN McINTOSH, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

Arthur Loevy
Jon Loevy                                   s/ Anand Swaminathan
Anand Swaminathan                           Attorney for Norman McIntosh
Steven Art
LOEVY & LOEVY
311 N. Aberdeen St., 3rd floor
Chicago, IL 60607
(312) 243-5900

Jennifer Blagg
1333 W. Devon Ave. Suite 267
Chicago IL 60660
(773) 859-0081